# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 23-0105V**

STACEY MOONEY,

Petitioner,

v.

SECRETARY OF HEALTH AND HUMAN SERVICES,

Respondent.

Chief Special Master Corcoran

Filed: September 29, 2025

*Brynna Gang, Kraus Law Group, LLC, Chicago, IL, for Petitioner.*

*Felicia Langel, U.S. Department of Justice, Washington, DC, for Respondent.*

## RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES[1]

On January 26, 2023, Stacey Mooney filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine received on January 22, 2021. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

The parties were unable to settle the claim, and have now fully briefed entitlement and damages (ECF Nos. 29, 30, 31). For the reasons set forth herein, I find that Petitioner is entitled to compensation, and award damages for actual pain and suffering in the amount of $105,000.00, plus $2,001.40 for unreimbursed, out-of-pocket medical expenses.

## I. Factual Evidence

### A. Medical Records

Petitioner received the vaccine alleged as causal in her right arm on January 22, 2021. Ex. 10 at 11. Three and a half months later (May 10, 2021), she saw advanced practice nurse ("APN") Ashley Getz for right upper arm pain and decreased range of motion ("ROM") that she reported began in January "right after injection for flu shot." Ex. 3 at 31. On examination, her right shoulder exhibited decreased ROM in all directions, with abduction limited to 90 degrees with pain and mildly decreased internal and external rotation. *Id*. APN Getz assessed her with likely tendonitis, and provided home exercises and a physical therapy ("PT") referral.

Two weeks later (May 26, 2021), Petitioner underwent a PT evaluation of her right shoulder. Ex. 1 at 10. The record lists an onset date of "January 2021," explaining that Ms. Mooney received a flu vaccine at the end of January, and then experienced pain and decreased ROM the night of vaccination. *Id*. She expected it to improve with time, but her condition plateaued in mid-February. *Id*.

At the time of the PT evaluation, Petitioner reported "very limited" ROM and pain with specific movements and at end range. Ex. 1 at 10. Some nights she could sleep on her right arm, but other times she could not. *Id*. She described the pain as achy and throbbing, and she sometimes had tingling into her fourth and fifth fingers. *Id*. She rated her pain level as two out of ten at present, ranging from one at best to ten at worst. *Id*. Her shoulder was most painful in the morning while getting dressed and fixing her hair. *Id*. The therapist noted that Petitioner exhibited fear avoidance behavior. *Id*. On examination, her right shoulder active ROM was 115 degrees in flexion, 85 degrees in abduction, 37 degrees in external rotation, and 15 degrees in internal rotation, all with pain. *Id*. at 12.

Petitioner continued PT, attending a total of four sessions between May 26 and June 17, 2021. Ex. 1 at 10, 22, 33, 44. She reported for a PT appointment on July 2, 2021, but her therapy was put on hold pending the results of an MRI because her pain was worsening and she was not tolerating her exercises well. *Id*. at 60.

Petitioner underwent a right shoulder x-ray on July 1, 2021, due to "[c]hronic right shoulder pain since January 2021 since receiving flu shot." Ex. 1 at 59. The x-ray showed

mild degenerative changes but was otherwise normal. An MRI done in mid-July 2021 showed mild supraspinatus, infraspinatus, and subscapularis tendinosis, findings suggestive of adhesive capsulitis, and mild degenerative changes. *Id*. at 69.

On August 9, 2021, Petitioner saw orthopedist Dr. Stephen Orlevitch for right shoulder stiffness and pain. Ex. 11 at 10. Her shoulder problems, she explained, began "after a painful flu shot into her right arm" on January 22, 2021. *Id*. She "felt pain immediately after the injection and was sore for a couple of weeks, and that just led to more soreness and stiffness in the right arm." *Id*. The pain was constant, with intermittent sharper pains with activity. *Id*. She had tried PT without relief or significant improvement. *Id*. On examination, Dr. Orlevitch noted that Petitioner's right shoulder ROM was "very limited," measuring 100 degrees in forward elevation, 85 degrees in lateral abduction, five degrees in external rotation, and ten degrees in internal rotation. *Id*. at 11. He described her as having "severe stiffness" from "a very stubborn case of adhesive capsulitis." *Id*. Because it had gone on for eight months and not improved with PT, he recommended surgery. *Id*.

Petitioner underwent right shoulder arthroscopic surgery on September 23, 2021. Ex. 6 at 92. Dr. Orlevitch performed extensive intra-articular debridement with inferior and anterior capsule release, debridement of a labral tear, debridement of a partial rotator cuff tear and chondroplasty, subacromial decompression and acromioplasty with excision of scar tissue, and manipulation under anesthesia. *Id*.

The day after surgery (September 24, 2021), Petitioner underwent a post-operative PT evaluation. Ex. 8 at 26. She was managing her pain, which she rated two out of ten at that time, with prescription pain medication. *Id*. On examination, her right shoulder passive ROM was 113 degrees in flexion and 60 degrees in abduction, which the therapist noted was "good for day one post op." *Id*. at 27.

Petitioner attended a total of 27 post-operative PT sessions between September 24, 2021, and January 17, 2022. Ex. 8 at 26-164; Ex. 10 at 15-116. By late December 2021, her ROM was within functional limits, although it remained somewhat limited. Ex. 10 at 72. At her final PT appointment on January 17, 2022, her shoulder was better and while her ROM had not fully recovered, it was "livable." *Id*. at 114. The only thing she could not do was fasten her bra in the back – but she could not do that before her injury either. *Id*. She reported discomfort with end range passive ROM. *Id*.

Petitioner continued seeing Dr. Orlevitch for post-operative appointments in late 2021 and early 2022. Ex. 11 at 17, 19, 21. In October and November 2021, he prescribed oral steroids, which helped her progress in PT. *Id*. at 19, 21. Petitioner saw Dr. Orlevitch for the last time on January 25, 2022. *Id*. at 23. She was doing well, with only intermittent pain in her right shoulder when she had stretched a lot. *Id*. Her shoulder ROM was only slightly diminished by about five degrees in forward flexion and abduction. *Id*. He noted

that she was "pleased with her outcome as am I." *Id*. There are no further relevant treatment records.

**B. Testimonial Evidence**

Petitioner filed three affidavits in support of her claim. Exs. 12, 13, 14. She states that the at-issue vaccination was "extremely painful," leading her to wonder if the needle had hit a bone because "it was nothing like any vaccination I have ever had. It just felt wrong." Ex. 12 at ¶ 4. That evening, her shoulder was "excruciatingly painful" and she used ice for the pain. *Id*. at ¶ 5. Over the next week, she continued icing her shoulder due to pain. *Id*. at ¶ 6. She talked with her husband and a colleague about how painful her shoulder was. *Id*. at ¶¶ 6, 7.

By February 2021, Petitioner had difficulty reaching overhead or moving her arm behind her to put on a jacket due to pain. Ex. 12 at ¶ 8. She started taking over the counter pain medication, although she had to use caution to avoid triggering migraines. *Id*. She assumed that the pain would go away if she waited, because "it seemed impossible to me that a vaccination could cause a lasting injury." *Id*. She explains that the year before, she went to an orthopedist for a knee injury and was told it would take a few months to heal, and "[t]hat's exactly what happened." *Id*. at ¶ 9. Therefore, she assumed that the same thing would occur with her shoulder. *Id*.

However, over the next few months, Petitioner's shoulder issues persisted. Ex. 12 at ¶ 10. When she would reach across her body with her right arm, her shoulder would "freeze up" and hit a stopping point in her ROM. *Id*. She adapted to the limitations, which improved her pain. *Id*. However, Petitioner is a teacher and her classroom aide (who is also a nurse) cautioned Petitioner that she may be developing frozen shoulder, and encouraged her to see a doctor. *Id*.

Petitioner wanted to see a doctor, but was worried about COVID-19 exposure and "kept putting it off." Ex. 12 at ¶ 11. At the time, there was a surge of COVID-19 cases and she did not think her shoulder problem was an emergency. *Id*. She also worried that if she became ill from seeking care for her shoulder, she would have to take at least two weeks off work and, due to a shortage of substitute teachers in her area, her students would suffer. *Id*. at ¶ 12.

By late April 2021, Petitioner was "beyond frustrated," realizing that her shoulder was not going to get better on its own like her knee had. Ex. 12 at ¶ 13. Her sleep was affected because she had difficulty sleeping on her right side. *Id*. She scheduled an appointment near the end of the school year at a time when COVID-19 case numbers were going down in her area. *Id*.

Petitioner started PT in late May 2021. Ex. 12 at ¶ 15. Over the next month, she went to PT and did home exercises, but her ROM was not improving and her pain seemed to be worsening. *Id*. at ¶ 16. Over the summer, she saw an orthopedist, who told her she

was unlikely to improve without surgery. *Id*. at ¶ 18. After discussion, she agreed to surgery. *Id*.

A month after surgery, Petitioner returned to her orthopedist and told him that her shoulder was improved, but she was having difficulty with some of her PT exercises, especially reaching up or across her body. Ex. 12 at ¶ 20. He prescribed oral steroids and instructed her to continue working on her ROM in PT. *Id*. The steroids helped, and she could now get dressed without assistance, but her shoulder still did not move normally and seemed like it would get “stuck.” *Id*. at ¶ 21.

At Petitioner’s last post-operative follow up, her orthopedist confirmed that she had improved significantly. Ex. 12 at ¶ 24. They discussed continuing formal PT, but she felt she was progressing on her own so they decided she would continue with home exercises. *Id*. Since surgery, her shoulder has “improved substantially.” *Id*. at ¶ 26. She no longer has constant pain during daily activities, but still has trouble reaching overhead or to the side. *Id*.

Mike Mooney, Petitioner’s spouse, also filed an affidavit in support of her claim. Ex. 13. He recalls her January 2021 vaccination because it occurred just two days after his birthday. *Id*. at ¶ 3. She went out of town the evening she received the vaccine (a Friday), and when she returned home two days later, she told him that her shoulder was “really bothering her from her flu shot.” *Id*. at ¶¶ 3, 4, 14. He thought it was strange because she gets a flu vaccine most years and had never complained of pain from it before. *Id*.

Over the next couple of weeks, Mr. Mooney could see that Petitioner was having problems with her right arm. Ex. 13 at ¶ 5. She had difficulty reaching for her seatbelt with her right arm in the car. *Id*. They discussed her going to the doctor, but “in our household, we typically avoid going to the doctor as long as possible.” *Id*. at ¶ 6. He recalls Petitioner saying she was going to give her shoulder more time to recover, which seemed reasonable to him. *Id*.

Petitioner’s shoulder did not thereafter improve, and Mr. Mooney helped her with getting dressed. Ex. 13 at ¶ 7. She remained very hesitant to see a doctor. *Id*. He explains that for the last couple of years, Petitioner had been working with students receiving special education services, and she is “overprotective” of them, putting them before herself. *Id*. at ¶ 8. At this time, COVID-19 cases were high in their area, and Petitioner worried that she could get COVID and pass it on to her students – some of whom are already at higher risk for illness. *Id*. This weighed heavily on her, and drove her decision to wait before going to a doctor. *Id*.

Mr. Mooney recalls that Petitioner ultimately waited until May to seek care, at which point school was almost over for the year. Ex. 13 at ¶ 9. Petitioner then started doing PT, but the exercises did not seem to go well. *Id*. at ¶ 10. When the orthopedist said she

needed surgery, he was happy because "[i]t was obvious that she wasn't getting better doing physical therapy." *Id*. at ¶ 11. After her surgery, PT seemed to help. *Id*. at ¶ 12.

In the months after surgery, Mr. Mooney states that Petitioner stopped complaining about her shoulder, and he could see that it was easier to move her arm. Ex. 13 at ¶ 13. She continued to have some difficulty reaching upward, and changed the way she puts on some clothing because of her shoulder. *Id*. She has adapted to how her arm moves now, and it no longer holds her back. *Id*

Kelly Christ, who has a nursing degree and worked as a nurse for six years and now works as a paraprofessional in Petitioner's classroom, submitted an affidavit on her behalf. Ex. 14. Ms. Christ recalls that in the winter of 2021, Petitioner mentioned that "she had gotten a flu shot and that her arm was 'killing' her." *Id*. at ¶ 6. Ms. Christ noticed that Petitioner had trouble lifting her right arm overhead, complaining of pain. *Id*. at ¶ 7. She told Petitioner she could be developing frozen shoulder and should seek medical care. *Id*.

## II. Factual Findings and Ruling on Entitlement

### A. Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must preponderantly demonstrate all matters required under Section 11(c)(1), including the factual circumstances surrounding his or her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs*., 993 F.2d 1525, 1528 (Fed. Cir. 1993).

To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V,

1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The Federal Circuit has "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (explaining that a patient may not report every ailment, or a physician may enter information incorrectly or not record everything he or she observes).

In addition to requirements concerning the vaccination received and the lack of other award or settlement,[3] a petitioner must establish that he or she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination he or she received. Section 11(c)(1)(C). The Vaccine Act further includes a "severity requirement," pursuant to which a petitioner demonstrate that they "suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine . . . ." Section 11(c)(1)(D).

"[T]he fact that a Petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013, 2019 WL 978825, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014) ("a discharge from medical care does not necessarily indicate there are no residual effects"). "A treatment gap . . . does not automatically mean severity cannot be established." *Law v. Sec'y of Health & Human Servs*., No. 21-0699V, 2023 WL 2641502, at *5 (Fed. Cl. Spec. Mstr. Feb. 23, 2023) (finding severity requirement met where Petitioner sought care for under three months and had met physical therapy goals but still lacked full range of motion and experienced difficulty with certain activities, then returned to care nearly five months later reporting stiffness and continuing restrictions in motion); *see also Peeples v. Sec'y of Health & Human Servs.*, No. 20-0634V, 2022 WL 2387749 (Fed. Cl. Spec. Mstr. May 26, 2022) (finding severity requirement met where Petitioner sought care for four months, followed by fifteen month gap); *Silvestri v. Sec'y of Health & Human Servs*., No. 19-1045V, 2021 WL 4205313 (Fed. Cl. Spec. Mstr. Aug. 16, 2021) (finding severity requirement satisfied where Petitioner did not seek additional treatment after the five month mark.

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a).

[3] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception and has not filed a civil suit or collected an award or settlement for his or her injury. Section 11(c)(1)(A)(B)(E).

Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time-frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
>
> (iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g*. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

**B. Parties' Arguments on Entitlement**

Petitioner argues that the evidence establishes that her shoulder pain began within

48 hours of vaccination. Petitioner's Motion for Ruling on the Record, filed May 20, 2024, at *9 (ECF No. 29) ("Mot."). When seeking treatment for her shoulder, Petitioner consistently reported that her pain began after vaccination, describing the onset as "right after injection" (Ex. 3 at 31-32), "that night" (Ex. 1 at 10), and "immediately after the injection" (Ex. 11 at 10). *Id*. These records are supported by testimonial evidence, and no records suggest a later onset. *Id*. at *9-10.

Respondent contends that Petitioner has not preponderantly demonstrated that her pain began within the Table-defined two-day timeframe. Respondent's Rule 4(c) Report and Response, filed Aug. 7, 2024, at *6 (ECF No. 30) ("Resp."). Respondent emphasizes that Petitioner did not seek care until May 10, 2021, three and a half months after vaccination. *Id*. Although she asserts her treatment delay resulted from an increase in COVID-19 cases in her area (offering Exhibit 15, a blog post from April 11, 2021), the blog does not specify which areas in her state were affected, and this was "still almost three months after" vaccination. *Id*. The fact that Petitioner did not report pain or seek treatment in the months following vaccination, Respondent reasons, "is strong evidence that her shoulder pain did not begin" within 48 hours of vaccination. *Id*.

Petitioner replies that it is noteworthy that "respondent cannot point to <u>a single medical record</u> in this matter that supports respondent's interpretation against finding entitlement." Petitioner's Reply, filed Aug. 20, 2024, at *2 (ECF No. 31) ("Reply") (emphasis in original). She emphasizes that "every single medical record correlates Ms. Mooney's right shoulder pain to her at-issue flu shot," and several records specifically place onset immediately after vaccination or the same day. *Id*.

### C. Factual Findings on Onset

The record supports a finding that, more likely than not, Petitioner's shoulder pain began within 48 hours of vaccination. Although she did not seek care until three and a half months after vaccination, she repeatedly and consistently related her pain to vaccination once she initiated treatment, reporting that it began "right after injection" (Ex. 3 at 31), the evening of vaccination (Ex. 1 at 10), and "immediately after the injection" (Ex. 11 at 10). No records suggest a later onset or cast doubt on these records. Petitioner's medical records are further supported by testimonial evidence.

Respondent points only to the fact of Petitioner's treatment delay and the applicability of the COVID-19 case data presented by Petitioner. But as I have stated many times in other decisions, it is not uncommon for SIRVA claimants to delay seeking care in the hope that the pain will resolve on its own. *Tully v. Sec'y of Health & Human Servs*., No. 21-1998V, 2024 WL 4533515 (Fed. Cl. Spec. Mstr. Sept. 20, 2024) (finding onset occurred within 48 hours although claimant did not seek care for two and a half months); *Diaz v. Sec'y of Health & Human Servs.*, 20-1003V, 2023 WL 8440873, at *6 (Fed. Cl. Spec. Mstr. Nov. 1, 2023) (finding onset was within 48 hours where the petitioner delayed seeking care for over three months after vaccination); *Buck v. Sec'y of Health &*

*Human Servs*., No. 19-1301V, 2023 WL 6213423, at *7 (Fed. Cl. Spec. Mstr. Aug. 23, 2023) (finding onset of pain occurred within 48 hours where the petitioner did not seek care for over three months and noting that a delay in seeking care is relevant to onset, but not dispositive).

In this case, Petitioner has reasonably explained that she expected her injury to resolve with time – as had occurred with a knee injury the prior year. In this context, a three and a half month delay in seeking care, after which Petitioner consistently related her pain to vaccination, does not prevent her from establishing Table onset.

### D. Factual Findings on SIRVA QAI Criteria and Statutory Requirements

The remaining QAI and statutory requirements are not disputed, and I find that they are satisfied. The record does not contain preponderant evidence that Petitioner had a history of left shoulder pain or any other condition that would explain her post-vaccination symptoms. Ex. 3 at 8, 21. She exhibited reduced ROM, and her pain and ROM limitations were limited to the vaccinated shoulder. Ex. 1 at 12; Ex. 3 at 31. She received a covered vaccine in the United States. Ex. 10 at 11. She experienced residual effects of her injury for more than six months. Ex. 11 at 10. And she states that she never received compensation in the form of an award or settlement for her vaccine-related injury, nor has she filed a civil action prior to this case. Ex. 12 at ¶ 27.

Petitioner has established by preponderant evidence that all Table SIRVA and QAI requirements are established. Further, she has established all statutory requirements for entitlement. Thus, Petitioner is entitled to compensation.

## III. Damages

### A. Legal Standard

In another recent decision, I discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within SPU. I fully adopt and hereby incorporate my prior discussion in Section II of *Matthews v. Sec'y of Health & Human Servs*., No. 22-1396V, 2025 WL 2606607 (Fed. Cl. Spec. Mstr. Aug. 13, 2025).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000.00." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and

suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[4]

### B. Parties' Damages Arguments

Petitioner seeks a pain and suffering award of $105,000.00, citing *Felland*, *Shelton*, and *Martin*, with awards of $100,000.00, $97,500.00, and $100,000.00, respectively.[5] Mot. at *15-20. Petitioner emphasizes that her case is similar to *Felland,* since like her, the *Felland* petitioner underwent surgery and had symptoms that persisted for a year. *Id*. at *15. However, she views her course as more severe, meriting a slightly higher award despite her longer treatment delay, because her examination findings were "significantly more severe" with much greater ROM limitations than the *Felland* petitioner's mildly reduced ROM. *Id*. Furthermore, Petitioner asserts that she required additional surgical procedures and attended a total of 31 PT sessions, compared to 12 for the *Felland* petitioner. *Id*. at *16. Petitioner also notes that after surgery her progress stagnated, resulting in two courses of oral steroids – a post-surgical complication not present in *Felland*. *Id*.

Petitioner deems her injury duration to be similar to that in *Shelton* and *Martin*. Mot. at *17-19. However, she sought care sooner than the *Shelton* petitioner, and had more severe pain than the *Martin* petitioner. *Id*. And she attended much more PT than either of the petitioners in those cases. *Id*.

Respondent proposes a pain and suffering award of $60,000.00. Resp. at *7. Respondent asserts that lesser amounts are appropriate in mild to moderate SIRVA cases, citing *Johnson*, where the claimant was awarded $65,000.00.[6] *Id*. at *10. Petitioner consistently reported a mild pain level of two out of ten, and delayed seeking treatment for "almost four months, which is additional evidence that her pain was mild." Resp. at *9. Although Petitioner asserts her treatment delay was due to rising COVID-19 cases in her area, she has not provided evidence that her locality was in fact affected, and the evidence she produced was from almost three months after vaccination. *Id*. at *9-10. Her MRI showed mild pathology, and she had full ROM within a year. *Id*. at *10.

---

[4] *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

[5] *Felland v. Sec'y of Health & Human Servs.*, No. 20-0406V, 2022 WL 10724100 (Fed. Cl. Spec. Mstr. Sept. 6, 2022); *Shelton v. Sec'y of Health & Human Servs.*, No. 19-279V, 2021 WL 2550093 (Fed. Cl. Spec. Mstr. May 21, 2021); and *Martin v. Sec'y of Health & Human Servs.*, No. 19-830V, 2021 WL 2350004 (Fed. Cl. Spec. Mstr. May 5, 2021).

[6] *Johnson v. Sec'y of Health & Human Servs*., No. 18-1486V, 2021 WL 836891 (Fed. Cl. Spec. Mstr. Jan. 25, 2021).

Respondent argues that mild to moderate SIRVAs are, as here, characterized by treatment delays of 40 days or more, significant initial pain of three months or less, mild to moderate limitations in ROM, MRI results showing mild to moderate pathology, one or two cortisone injections, two months or less of PT, and a symptom duration of six to 29 months – plus *no surgery*. Resp. at *10. Although Petitioner *did* in fact undergo surgery, Respondent asserts that "her shoulder pathology at just eight months post-vaccination was undoubtedly chronic and unrelated to her vaccination," so such unrelated conditions are not compensable. *Id*. In advancing this argument, Respondent appears[7] to refer to "arthritis, SLAP tear, and down-sloping acromion with scar tissue" as the unrelated conditions (Resp. at *13) – although he does not address the fact that even if all of these conditions existed prior to vaccination, Petitioner did not have shoulder symptoms until *after* vaccination.

Respondent further asserts that Petitioner's comparable decisions are inapposite. The *Felland* petitioner, for example, sought care just 34 days after vaccination and self-medicated with anti-inflammatory medication three times a day for pain, which Respondent suggests are "indicative of significant pain, and his shoulder pathology at surgery was not obviously chronic." Resp. at *11. Respondent acknowledges, however, that the *Felland* petitioner's SIRVA duration was eleven months – shorter than Ms. Mooney's – as well as the fact that his MRI showed mild pathology, and that he attended less PT than Ms. Mooney. *Id*.

Respondent acknowledges that the *Shelton* petitioner delayed treatment longer, but nonetheless asserts that this claimant had a longer symptom duration, her shoulder pathology at surgery "was not obviously chronic," and (incorrectly) asserts that the *Shelton* petitioner had greater pain ratings.[8] Resp. at *11-12. And Respondent argues that the *Martin* petitioner presented much sooner (eleven days after vaccination) and "his shoulder pathology at surgery was not obviously chronic." *Id*. at *12.

Petitioner points out in reaction that Respondent compares "this surgical SIRVA injury matter to a single non-surgical case of mild severity, and actually *argu[es] for less* than what was awarded" in that case. Reply at *3-4 (emphasis in original). And Petitioner argues that *Johnson* is "markedly distinguishable" from her own case. *Id*. at *4. The *Johnson* petitioner had a long history of back pain that was found to be contributory to her pain level, and treated for only six months with six PT sessions, one steroid injection,

---

[7] Although Respondent asserted several times in his response that Petitioner shoulder pathology was 'obviously chronic,' (Resp. at * 10, 11, 12) he did not cite any condition or medical records in support of this contention until the final page of his response, where he noted the arthritis, SLAP tear, and acromion type (Resp. at *13). I infer that these are the conditions which he believes are 'obviously chronic.'

[8] Respondent correctly states that the *Shelton* petitioner rated her pain between two and eight out of ten. Resp. at *12. However, contrary to Respondent's assertion that "Petitioner consistently rated her pain at a mild 2/10," (Resp. at *9), at one point Ms. Mooney's pain ratings ranged to ten out of ten. Ex. 1 at 10.

and oral steroids. *Id*. Petitioner asserts that comparison to a non-surgical case is not appropriate, and the record reflects that Ms. Mooney's course was "substantially more severe than in *Johnson*." *Id*.

Petitioner agrees that hers was a milder surgical case, with lower post-surgical pain levels and a good recovery. Reply at *4. However, her ROM deficits, functional limitations, "severe stiffness," and pain levels resulted in recommended surgical intervention. *Id*. at *4-5. Petitioner objects to Respondent comparing this mild *surgical* case to a mild *non-surgical* case. *Id*. at *5. Instead, this case should be compared to other mild *surgical* cases – which Petitioner has done. *Id*. She maintains that Respondent's damages position boils down to a claim that, because her imaging showed mild arthritis in addition to findings seen as consistent with adhesive capsulitis, she likely had a pre-existing chronic shoulder condition. Reply at *5. But Petitioner's medical records document no history of right shoulder pain prior to vaccination – suggesting that her post-vaccination shoulder pain was not in fact attributable to the mild arthritis seen on imaging. *Id*. It was only *after vaccination* that Petitioner developed right shoulder pain. *Id*.

Petitioner emphasizes that her treating orthopedist attributed her right shoulder pain to vaccination, opining that her symptoms were attributable to "severe stiffness from adhesive capsulitis" that had been present for almost eight months. Reply at *6 (citing Ex. 11 at 10-11). Petitioner asserts that this record underscores that it was not arthritis that triggered Petitioner's clinical presentation and need for surgical intervention; rather, it was adhesive capsulitis following vaccination. *Id*.

### C. Appropriate Compensation for Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

Petitioner experienced a relatively mild SIRVA requiring surgery, and a treatment course that persisted for about a year. She received two rounds of PT totaling 31 sessions, oral steroids, surgery, and over the counter pain medication. Although she initially delayed seeking treatment in the hope that her shoulder would improve on its own, once she began seeking care she did so persistently, without any notable gaps. Her orthopedist described her as having "severe stiffness," which, along with her ROM measurements leads me to conclude her ROM limitations were significant. Following surgery and PT, she had a good recovery.

Having reviewed the entire record and the parties' arguments, I find that this case is most similar to *Felland*. Both the *Felland* petitioner and Ms. Mooney experienced milder SIRVAs that were treated with surgery and resolved in approximately one year. While the *Felland* petitioner sought care sooner (34 days after vaccination), Ms. Mooney rated her

pain higher, up to ten out of ten, had significantly greater ROM restrictions, and attended much more PT. And the *Felland* petitioner had "no pain or impairment" by eleven months after vaccination – compared to Ms. Money, who at one year was happy with her progress, but still had intermittent pain and slightly diminished ROM. In light of Petitioner's greater severity of pain and ROM limitations, as well as the slightly longer duration and additional PT, I find that, notwithstanding Petitioner's treatment delay, Ms. Mooney should receive a pain and suffering award somewhat higher than the *Felland* petitioner.

*Johnson* is not a good comparable. That claimant did not undergo surgery – treating only with PT, medications and a cortisone injection. And her injury duration was much shorter: she treated for only six months after vaccination, at which point she reported improvement from a cortisone injection and stopped seeking care for nearly two years. In short, beyond both petitioners having suffered a SIRVA resulting from a flu vaccine, *Johnson* and this case bear little similarity. Respondent's citation of *Johnson*, and advocating for a *lesser* award in this surgical case, is unavailing.

Respondent's argument may rest on the assumption that because Petitioner's imaging showed subclinical degenerative changes, her damages should be reduced. If Petitioner had preexisting degenerative changes *that were symptomatic* prior to vaccination, I would agree that this would warrant a reduction in award. But imaging obtained to explore diagnostically the basis for SIRVA-like symptoms often reveals a number of comorbid, subclinical conditions – findings that may not have been themselves caused by a SIRVA, but which do not prevent a finding that a Table SIRVA is established. While there are cases where such findings suggest a better explanation for symptoms, that has not been established under the facts of this case.

In light of the record evidence, I find that an award of **$105,000.00** for pain and suffering is appropriate.

## Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I GRANT Petitioner's motion for a ruling on the record, and find that Petitioner suffered an injury that meets the definition for a Table SIRVA and is entitled to compensation. I find that $105,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering**.[9] Additionally, I

---

[9] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

find that Petitioner is entitled to **$2,001.40 in out-of-pocket expenses**.[10]

Based on consideration of the record as a whole and arguments of the parties, **I award Petitioner a lump sum of $107,001.40, to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of Court is directed to enter judgment in accordance with this Decision.[11]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

[10] The parties agree that this amount is reimbursable. Mot at *20; Resp. at *7 n.4; 13.

[11] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.